**UNITED STATES DISTRICT COURT
NORTHERN DISTRICT OF ILLINOIS
EASTERN DIVISION**

| | | |
|---|---|---|
| NICKIE DENNARD, SHARI LEWAN, JESSICA VANDENBOSCH, STEPHEN SLEEM, DEREK JOHNSON, LINDA DAVAULT, DR. TERRELL REHMUS JACQUELINE CLEGG, REGINA LANGLEY, GERALD  KREUTZER, and MICHAEL GIACCHINO | ) ) ) ) ) ) ) ) | |
| Plaintiffs, | ) ) | |
| v. | ) ) | Case No. _____ |
| ASTELLAS PHARMA INC., | ) ) ) | |
| Defendant. | ) ) | |

**VERIFIED COMPLAINT**

For their VERIFIED COMPLAINT against Defendant, ASTELLAS PHARMA INC. ("Astellas" or "Defendant"), Plaintiffs, NICKIE DENNARD, SHARI LEWAN, JESSICA VANDENBOSCH, STEPHEN SLEEM, DEREK JOHNSON, LINDA DAVAULT, DR. TERRELL REHMUS, JACQUELINE CLEGG, REGINA LANGLEY,  GERALD KREUTZER, and MICHAEL GIACCHINO ("Plaintiffs"), allege and aver as follows:

**<u>INTRODUCTION</u>**

1.      This is an action brought to remedy Astellas' discrimination against employees who requested religious exemptions and accommodations from Astellas' COVID-19 vaccine mandate.

2.      Plaintiffs are pharmaceutical professionals, all of whom have sincerely held religious beliefs against the COVID-19 vaccines because they were either developed from, or tested upon, aborted fetal cells lines, or for other religious reasons that were explained to Astellas. Because of Astellas' unlawful actions in denying Plaintiffs' meritorious exemption requests,

Plaintiffs faced an immediate "choice" to either (a) receive a COVID-19 vaccination in direct violation of their conscience and sincerely held religious beliefs, or (b) be terminated from their employment with Astellas as a consequence of exercising their fundamental and statutory rights to refuse administration of the COVID-19 vaccines.[1]

3.      Plaintiffs have earnestly, honestly, and in good faith sought religious exemptions and reasonable accommodations from Astellas' Mandatory COVID-19 Vaccination Policy, but have been rejected at every turn.

4.      Plaintiffs have complied with all requirements for seeking an accommodation and exemption based upon their sincerely held religious beliefs, and otherwise complied with all of the requirements Astellas established for seeking a religious exemption from the Mandatory COVID-19 Vaccination Policy.

5.      While Astellas claims it would have been an "undue hardship" to allow Plaintiffs to keep their positions, Astellas has granted numerous other exemptions from the Mandatory COVID-19 Vaccination Policy with accommodations. The exemptions which Astellas granted were based on identical or substantially similar religious beliefs as those espoused by Plaintiffs, and was given to persons who were in the same type of positions as Plaintiffs.

6.      The Illinois Health Care Right of Conscience Act and Title VII of the Civil Rights Act of 1964 ("Title VII"), protect the right of individuals to refuse administration of an unwanted medical product when acceptance of such product would violate their sincerely held religious beliefs and the exercise of the same. Astellas' Mandatory COVID-19 Vaccination Policy,

---

[1] "Such a Hobson's choice is actually no choice at all." *Smith v. Grams*, 565 F.3d 1037, 1046 (7th Cir. 2009) (emphasis added).

2

including its refusal to grant meritorious religious exemption requests, ignores these fundamental protections for Plaintiffs' sincerely held religious beliefs.

## PARTIES

7.      Plaintiff Nickie Dennard is an Executive Medical Specialties Representative at Astellas residing in Georgia. Dennard has worked at Astellas for 11 years, winning numerous awards including 2 Summit Clubs and ranking first on her team for sales in 2021. Dennard was denied a religious exemption and accommodation even before actually requesting the exemption and accommodation. Dennard also applied for a medical exemption to which Astellas never responded. Dennard has already contracted COVID-19 and fully recovered. Dennard is the sole caretaker for her child as well as caring for her elderly parents.

8.      Plaintiff Shari Lewan is a former Executive Representative-II Prostate at Astellas residing in Ohio. Lewan had worked at Astellas for 7 years. Lewan submitted a signed, written request for an exemption and accommodation from Astellas' Mandatory COVID-19 Vaccination Policy, which Astellas denied. Lewan resigned from Astellas in February 2022 and accepted a similar position with another pharmaceutical company. Lewan had been recently promoted in December 2021, had 3 national sales awards, and served on her team's Culture Club.

9.      Plaintiff Jessica Vandenbosch is a former Senior Executive Oncology Representative at Astellas residing in Indiana. Vandenbosch had worked at Astellas for 7 years. Vandenbosch submitted a signed, written request for an exemption and accommodation from Astellas' Mandatory COVID-19 Vaccination Policy, which Astellas denied. Vandenbosch had already contracted COVID-19 and fully recovered. Vandenbosch was terminated by Astellas on March 31, 2022. Prior to her termination, Vandenbosch ranked first in sales on her team, second in the nation, and qualified for the Sales Excellence Summit. Vandenbosch has won multiple sales

awards and competitions at Astellas and was on multiple leadership task force groups because of her leadership qualities. In December 2021, Vandenbosch was promoted to the highest-level sales representative position (Level 7).

10. Plaintiff Stephen Sleem is a former Senior Executive Oncology Representative at Astellas residing in Michigan. Sleem had worked at Astellas for over 5 years. Sleem submitted a signed, written request for an exemption and accommodation from Astellas' Mandatory COVID-19 Vaccination Policy, which Astellas denied. Sleem had already contracted COVID-19 and fully recovered. Sleem was terminated by Astellas on March 31, 2022. Prior to his termination, Sleem ranked second in sales on his team. Since his termination, Sleem has gone on unemployment and at 63 years of age, has found it difficult to obtain new employment.

11. Plaintiff Derek Johnson is a former Regional Sales Manager at Astellas residing in Virginia. Johnson had worked at Astellas for 8 years. Johnson submitted a signed, written request for an exemption and accommodation from Astellas' Mandatory COVID-19 Vaccination Policy, which Astellas denied. Johnson had already contracted COVID-19 and fully recovered. Johnson was terminated by Astellas on January 21, 2022.

12. Plaintiff Linda Davault is a former Senior Executive Sales Representative II at Astellas residing in Georgia. Davault had worked at Astellas for almost 16 years. Davault submitted a signed, written request for an exemption and accommodation from Astellas' Mandatory COVID-19 Vaccination Policy, which Astellas denied. Davault had already contracted COVID-19 and fully recovered. Davault was terminated by Astellas on March 31, 2022. Davault, who is 54 years of age, has found it difficult to obtain alternate employment, has been forced to sell her home, and is moving to a different state. Davault had previously won numerous sales awards with Astellas and was highly ranked on her team before being terminated.

4

13.     Plaintiff Dr. Terrell Rehmus is a former Associate Director Medical Values and Access at Astellas residing in Missouri. Rehmus had worked at Astellas for almost 4 years. Rehmus submitted a signed, written request for an exemption and accommodation from Astellas' Mandatory COVID-19 Vaccination Policy, which Astellas denied. Rehmus had already contracted COVID-19 and fully recovered. Rehmus was terminated by Astellas on March 31, 2022.

14.     Plaintiff Jacqueline Clegg is a former Senior Executive Representative at Astellas residing in North Carolina. Clegg had worked at Astellas for almost 2 years. Clegg submitted a signed, written request for an exemption and accommodation from Astellas' Mandatory COVID-19 Vaccination Policy, which Astellas denied. Clegg had already contracted COVID-19 and fully recovered. Clegg was terminated by Astellas on March 31, 2022. Prior to her termination, Clegg ranked third in the nation for sales of a leukemia drug.

15.     Plaintiff Regina Langley is a former Senior Hospital Representative at Astellas residing in Pennsylvania. Langley had worked at Astellas for 10 years. Langley submitted a signed, written request for an exemption and accommodation from Astellas' Mandatory COVID-19 Vaccination Policy, which Astellas denied. Langley was terminated on March 31, 2022. Langley had previously received multiple awards for exceeding sales goals and was awarded the top sales award in her division twice.

16.     Plaintiff Gerald Kreutzer is a former Senior Hospital Representative at Astellas residing in Kansas. Kreutzer had worked at Astellas for 14 years. Like Plaintiff Dennard, Kreutzer was denied a religious exemption before he even applied for one. Astellas refused to allow Kreutzer to apply for a religious exemption, informing him that Astellas had already decided any exemption and accommodation would cause an undue hardship. Kreutzer resigned from Astellas on February 16, 2022.

5

17. Plaintiff Michael Giacchino is a Senior Director Corporate Accounts Government East at Astellas residing in Pennsylvania. Giacchino has worked at Astellas for over 7 years meeting and exceeding expectations, winning awards such as HIRC and Leadership awards. Giacchino is currently ranked second for the Summit Club National performance award for 2021. Giacchino was promoted to his current role in August of 2020 from the managed markets manager role due to his strong performance. Giacchino submitted a signed written request for a religious exemption and accommodation from Astellas' mandatory COVID-19 vaccination policy, which Astellas denied. After repeated appeals, Astellas provided Giacchino a temporary pause on termination and required him to work virtually. Astellas eventually notified Giacchino that his employment would be terminated effective June 2, 2022.

18. Defendant, Astellas Pharma Inc., is a Japanese pharmaceutical company with U.S. headquarters located at 1 Astellas Wy, Northbrook, IL 60062.

## JURISDICTION AND VENUE

19. This action arises under the laws of the United States, specifically, 42 U.S.C. § 2000e, *et seq*. This action also arises under the laws of the State of Illinois, specifically the Illinois Health Care Right of Conscience Act, 745 ILCS 70, *et seq.*

20. This Court has jurisdiction over this action pursuant to 28 U.S.C. §§1331, 1343, and 1367.

21. Venue is proper in this Court pursuant to 28 U.S.C. §1391(b)(1)(2) because Defendant is headquartered in Cook County and a substantial part of the events or omissions giving rise to Plaintiffs' claims occurred in this district.

22.     This Court is authorized to grant declaratory judgment under the Declaratory Judgment Act, 28 U.S.C. §§2201-02, implemented through Rule 57 of the Federal Rules of Civil Procedure.

23.     This Court is authorized to grant Plaintiffs' prayer for relief regarding damages pursuant to Rule 54 of the Federal Rules of Civil Procedure and the supplementary laws of the State of Illinois, as applicable under Fed. R. Civ. P. 69.

24.     This Court is authorized to grant Plaintiffs' prayer for relief regarding damages, including treble damages, under the Illinois Health Care Right of Conscience Act, 745 ILCS 70/12.

25.     This Court is authorized to grant Plaintiffs' prayer for relief regarding costs and expenses, including reasonable attorneys' fees, pursuant to the Illinois Health Care Right of Conscience Act, 745 ILCS 70/12.

## GENERAL ALLEGATIONS

### A.     BACKGROUND.

26.     More than two years ago, a global outbreak of a virus now referred to as COVID-19 began to emerge.

27.     COVID-19 was officially declared a pandemic by the World Health Organization in March 2022.

28.     At that time, little was known about the virus and great efforts were made by the public and private sector alike to develop a vaccine.

29.     To combat the spread of the virus, public health experts opined that the public should practice social distancing, wear masks, and isolate if showing symptoms of COVID-19.

Employers across the country began requiring employees to practice these measures, and many also began permitting remote work.

30.     The U.S. Food and Drug Administration eventually granted Emergency Use Authorization for a COVID-19 vaccine, the Pfizer-BioNteach vaccine, on December 11, 2020. The Moderna vaccine was granted Emergency Use Authorization on December 18, 2020, followed by the Johnson & Johnson vaccine on February 27, 2021.

31.     With vaccines available to the general public, employers began to mandate that employees get vaccinated or else suffer adverse employment action such as being placed on unpaid leave or being terminated.

32.      Astellas initially rejected the push to force employees to get vaccinated.

33.     In March 2021, Astellas informed its employees that "The Company encourages, but will not require, vaccination for our employees, where appropriate." Likewise, Astellas assured employees that "we respect each individual's decision whether to do so." That same communication also informed employees that they would not be required to report their vaccination status. **Exhibit A, Corporate Communications.**

34.     On June 30, 2021, Astellas communicated to its employees that it "will not require employees to report vaccination status" and instead offered other accommodations stating "employees who are unvaccinated or who choose not to disclose their vaccination status may be subjected to heightened screening or restricted entirely from participating in certain in-person events or activities." In addition, Astellas provided that visitors to the Northbrook headquarters needed only to provide proof of a negative COVID-19 test. Exhibit A.

35.     On July 9, 2021, Astellas wrote employees to "reaffirm" the company's position on vaccination. In that letter, Fumiaki Sakurai, Chief Administrative Officer and Chief Ethics and

Compliance Officer, wrote to reemphasize that "Astellas would respect each individual's decision" concerning vaccination and stressed that "Astellas will not require employees to get vaccinated." Exhibit A. Furthermore, Mr. Sakurai stated that "Astellas will not tolerate any harassment, prejudice, or unlawful discrimination against those who do not take the vaccine. We must also be mindful of each individual's right to medical privacy, and will not require employees to reveal their vaccination status . . . ." Even more, Mr. Sakurai noted that **"In Japan, there have been reports that people are urged to resign or are reassigned if they do not take the vaccine, or are harassed by the thoughtless words and actions of those around them. We will never tolerate such behavior . . . . we will respect the decision of each employee with regard to vaccination."** Mr. Sakurai concluded the letter stating that "Astellas reaffirms our respect for the human rights of our employees, including the right to be free from unlawful discrimination and harassment."

36.     Since the start of the pandemic, field employees, including the Plaintiffs, continued to work and thrive under this understanding. Plaintiffs continued to meet with their clients in-person, or for a few clients, remotely, based on client preferences. The Plaintiffs' clients never asked about Plaintiffs' vaccination status, nor did they place any conditions or demands on Plaintiffs to get vaccinated.

37.     Moreover, Plaintiffs continued to excel at their work, as they did prior to the pandemic, with several of them ranking among the top salespersons and representatives and even obtaining promotions during the pandemic.

38.     The Plaintiffs' ability to work without a vaccine mandate for almost two years after the start of the pandemic, and almost one year after a vaccine was made available, did not cause Astellas any undue hardship. Indeed, Astellas itself repeatedly informed its employees throughout

the pandemic, and even after the vaccine was available, that there was no need to compel employees to get vaccinated, that their rights and medical privacy would be respected, and that "heightened screening" or remote work were workable accommodations. The story, however, took a sudden and unexpected turn for the worse in October of 2021, when the company completely reversed course, and did (and allowed) that which it promised it never would.

**B.      ASTELLAS' MANDATORY COVID-19 VACCINATION POLICY.**

39.      On October 5, 2021, Astellas for the first time announced, contrary to previous representations, that all U.S. employees "as a condition of continued employment" must be vaccinated and verify their vaccination status by January 3, 2022. **Exhibit B, COVID-19 Mandate.** Astellas assured employees, however, that "Exceptions for qualified medical reasons or sincerely held religious beliefs will be provided."

40.      Astellas also circulated a "COVID Mandate FAQ" which explained to employees that the company would assess accommodation requestions on a case-by-case basis and engage in the "interactive process." **Exhibit C, COVID Mandate FAQ.** The FAQ document further states that unvaccinated employees who were not granted an accommodation by January 3, 2022, would be placed on unpaid leave until March 31, 2022, at which point they would be terminated.

41.      The Mandatory COVID-19 Vaccination policy does not apply to Astellas employees outside of the U.S. and all international employees at Astellas remain free to work without any vaccine mandate.

42.      The Mandatory COVID-19 Vaccination Policy does not take into account individuals who have already recovered from COVID-19 and thus have antibodies or natural immunity, nor does it take into account alternative measures such as face coverings, personal protective equipment, self-monitoring and reporting of symptoms, or periodic testing.

43. Astellas' Mandatory COVID-19 Vaccination Policy contrasts with the Federal government's policy allowing certain large employers to mandate vaccination *or* periodic testing for their employees.

44. The Mandatory COVID-19 Vaccination Policy also differs substantially from the European Union's digital COVID-19 certificate, which considers the following as equivalent: (1) a COVID-19 vaccine; (2) a negative COVID-19 test; or (3) having previously recovered from COVID-19. *See EU Digital COVID Certificate*, EUROPEAN COMMISSION, https://ec.europa.eu/info/live-work-travel-eu/coronavirus-response/safe-covid-19-vaccines-europeans/eu-digital-covid-certificate_en.

45. Although Astellas has remained firm on its vaccine policy, it has not mandated that employees receive any boosters, even though health experts have opined that the effect of a vaccine wanes and that non-boosted individuals pose a risk because they are not up to date.

46. In order to obtain a religious exemption from the Mandatory COVID-19 Vaccination Policy, employees had to complete a "Religious Accommodation Request Form: COVID-19" which also included a "Religious Leader/Attestor Certification Form." Plaintiffs completed the required forms and obtained certifications from their religious leaders. **Exhibit D, Religious Exemption Forms.**

47. Although the Plaintiffs completed the forms and adequately described their religious beliefs, and even though Astellas had stated that "Exceptions for qualified medical reasons or sincerely held religious beliefs will be provided," the majority of those that submitted religious exemption requests were denied with the same boilerplate language:

> "The Company has reviewed all of the information you have provided in light of your job description and assessed the feasibility of the proposed accommodations in order to continue to allow you to perform the essential functions of your job. After careful consideration, Astellas has determined that allowing an accommodation to the vaccination

11

requirement in your circumstance would present an undue hardship to the Company due to the public-facing nature of your role and continuing threat posed by the COVID-19 pandemic." **Exhibit E, Religious Exemption Denial.**

48.    Astellas further explained in its denial that it was compelled to mandate vaccines in order to reduce "the risk of potential transmission to others" even though Astellas previously informed employees of a CDC study which "found no significant difference in the viral load present in breakthrough infections occurring in fully vaccinated people vs. infections in those who are vaccinated." **Exhibit F, Aug. 17, 2021 Letter.**

49.    Astellas did not provide any means by which employees could appeal the denial of their religious exemption and accommodation requests.  The Plaintiffs were then placed on unpaid leave and were (beside those who resigned) eventually terminated on March 31, 2022.[2] In an attempt to save their jobs, some of the Plaintiffs had inquired about transitioning to other roles within the company where they could be accommodated. Astellas representatives either never responded to these inquires, or informed Plaintiffs that no such positions were available.

50.    Astellas' blanket denials of Plaintiffs' religious exemption requests is in stark contrast to its approval of identical or substantially similar religious exemptions requests from employees living in certain states like Florida or Texas. For those employees, Astellas stated that "After careful consideration, Astellas will grant your request your accommodation on a provisional basis at least until March 31, 2022." **Exhibit G, Religious Exemption Approval.** Those individuals were not threatened with unpaid leave and eventual termination, but were allowed to

---

[2] One exception is Plaintiff Dereck Johnson, who was terminated on January 21, 2022, after he accepted another position while on unpaid leave to earn income to support his family. Astellas terminated Johnson claiming the new position was a conflict of interest, even though the position involved helping veterans and did not conflict with Astellas' pharmaceutical interests.

continue working remotely, even though they had the same or similar job titles, roles, and responsibilities as the Plaintiffs who were denied.

51.     On March 3, 2022, Astellas extended the religious exemptions and accommodations provided to these employees until October 1, 2022 "based upon the continued workability of the accommodation and applicable state law." **Exhibit H, Extension of Exemptions.**

52.     Plaintiffs are also aware of other religious exemptions granted to employees with similar job titles and roles. For example, Astellas provided one employee in Louisiana an exemption and accommodation after an attorney sent a demand letter. **Exhibit I, LA Exemption Approval.** Plaintiffs are also aware of an employee in South Carolina that was provided a medical exemption. In addition, Astellas approved a religious exemption to an Alabama employee after he received a favorable ALJ decision under Alabama state law. **Exhibit J, AL Exemption Approval.** Astellas made sure to comment that it "disagree[d] with that decision" indicating that it would have terminated that employee as well had that state law not interfered.

53.     Astellas' denials of Plaintiffs' religious exemption and accommodation requests are not only at odds with the numerous religious exemptions and accommodations it has granted to some select employees, Astellas' decision to deny Plaintiffs' religious exemptions was not made on a case-by-case basis and was made without engaging in the interactive process with each employee to discuss the exemption requests and evaluate potential accommodations.

54.     This conclusion is supported by Plaintiff Dennard's experience. Ms. Dennard requested a religious exemption form which she did not initially submit. Yet, Ms. Dennard was surprised to learn that her religious exemption, which she did not submit, was denied. When she inquired about how she could be denied a religious exemption which she never requested, a

company representative, Shontelle Dodson, responded that ***"the idea was to share the information with you sooner rather than later . . . . any religious accommodation request you would have submitted would ultimately have been denied* . . ."[3] Exhibit K, Dodson Email.**

55.    Likewise, Plaintiff Kreutzer was not even allowed to submit a religious exemption and was informed by Astellas ahead of time that any request he would have made would have amounted to an undue hardship on the company.

56.    Astellas has conceded, therefore, that it did not engage in case-by-case evaluation or in the interactive process. Indeed, it is difficult to understand how Astellas could have possibly denied certain religious exemptions on an individualized basis, completed a "careful review of the documentation," or otherwise engaged in the interactive process when Dennard never submitted anything to the company and when Kreutzer was not even allowed to apply for a religious exemption. Rather, Ms. Dodson's honest response demonstrates that Astellas had a pre-determined outcome and any religious exemption request was going to be denied regardless of what the application actually said or the specific circumstances of the applicant, and so long as no state law interfered with that predetermined outcome.

57.    Not only were Plaintiffs subjected to unpaid leave and eventually termination, but Astellas also perpetrated, and allowed, various forms of harassment and blatant discrimination against employees on account of their vaccine status. For example, one senior leader at Astellas was openly heard to have proclaimed that all unvaccinated people should be denied medical treatment and just die. Others experienced constant shaming, being pressured to abandon their

---

[3] Although Dennard was denied a religious exemption before she even applied for one, Dennard decided to still submit the religious exemption form after she received the denial.

beliefs under threat that they would never be able to get a job anywhere ever again. Astellas representatives have also called unvaccinated employees uneducated, stupid, and immature, and unvaccinated employees have been made fun of and belittled because of their religious beliefs. Senior leaders at Astellas were aware of these instances and failed to take any action. These actions, and inactions, not only violate federal and state law, but Astellas' own "Anti-Discrimination and Harassment Policy." **Exhibit L, Policy.**

58. On December 21, 2022, Plaintiffs' counsel submitted a letter to Astellas explaining that the denials of Plaintiffs' religious exemption and accommodation requests violated federal and state law. On January 17, 2022, counsel for Astellas responded denying the same. In that letter, counsel for Astellas claimed that "Astellas has granted accommodations to the vast majority of employees who made such requests . . . ." But Astellas has never explained, assuming that statement is true, how accommodating these Plaintiffs could have caused an "undue hardship" all of a sudden if the vast majority of employees who requested exemptions were accommodated. **Exhibit M, Attorney Letters.**

59. As a result of Astellas placing Plaintiffs on unpaid leave and eventually terminating them, Plaintiffs sought alternative employment with other pharmaceutical companies, with some of the Plaintiffs recently accepting new positions. Based on Plaintiffs' research, job interviews, and conversations with colleagues at other pharmaceutical companies, many pharmaceutical companies do not operate with any vaccine mandate, or provide employees with religious exemptions and accommodations such as regular testing or masking.

60. Indeed, even as companies across the U.S. as well as federal and local governments have lessened restrictions, and as COVID-19 cases have dropped significantly, Astellas has

continued to insist that employees be vaccinated and to deny employees like the Plaintiffs reasonable exemptions and accommodations.

61.     As a result of Astellas' actions, Plaintiffs have sustained damages including, but not limited to, lost income, lost bonuses, lost insurance, lost company benefits, career changes with lesser pay, emotional distress, and trauma.

### C.     PLAINTIFFS AND THEIR SINCERELY HELD RELIGIOUS BELIEFS.

62.     Plaintiffs have sincerely held religious beliefs that preclude them from complying with the Mandatory COVID-19 Vaccination Policy because of the connection between all three COVID-19 vaccines (in their origination, production, development, or testing), and the cell lines of aborted fetuses, or other similar religious beliefs.

63.     A fundamental component of Plaintiffs' sincerely held religious beliefs is that all life is sacred, from the moment of conception to natural death, and that abortion is a grave sin against God and the murder of an innocent life.

64.     Plaintiffs' sincerely held religious beliefs are rooted in Scripture's teachings that "[a]ll Scripture is given by inspiration of God, and is profitable for doctrine, for reproof, for correction, [and] for instruction in righteousness." *2 Timothy* 3:16 (KJV).

65.     Because of that sincerely held religious belief, Plaintiffs believe that they must conform their lives, including their decisions relating to medical care, to the commands and teaching of Scripture.

66.     Plaintiffs have sincerely held religious beliefs that God forms children in the womb and knows them prior to their birth, and that because of this, life is sacred from the moment of conception. *See Psalm* 139:13-14 ("For you formed my inward parts; you knitted me together in my mother's womb. I praise you, for I am fearfully and wonderfully made." (ESV)); *Psalm* 139:16

16

("Your eyes saw my unformed substance; in your book were written, every one of them, the day that were formed for me, when as yet there was none of them." (ESV)); *Isaiah* 44:2 ("the Lord that made thee, and formed thee from the womb . . ." (KJV)); *Isaiah* 44:24 ("Thus saith the Lord, thy redeemer, and he that formed thee from the womb, I am the Lord that maketh all things." (KJV)); *Isaiah* 49:1 ("The Lord hath called my from the womb; from the bowels of my mother hath he made mention of my name." (KJV)); *Isaiah* 49:5 ("the Lord that formed me from the womb to be his servant" (KJV)); *Jeremiah* 1:5 ("Before I formed thee in the belly I knew thee; and before thou camest forth out of the womb I sanctified thee, and I ordained thee." (KJV)).

67.     Plaintiffs also have sincerely held religious beliefs that every child's life is sacred because they are made in the image of God. *See Genesis* 1:26-27 ("Let us make man in our image, after our likeness . . . So God created man in his own image; in the image of God created he him; male and female created he them." (KJV)).

68.     Plaintiffs also have sincerely held religious beliefs that because life is sacred from the moment of conception, the killing of that innocent life is the murder of an innocent human in violation of Scripture. *See, e.g.*, *Exodus* 20:13 ("Though shalt not kill." (KJV)); *Exodus* 21:22-23 (setting the penalty as death for even the accidental killing of an unborn child); *Exodus* 23:7 ("the innocent and righteous slay thou not, for I will not justify the wicked." (KJV)); *Genesis* 9:6 ("Whoso sheddeth a man's blood, by man shall his blood by shed: for in the image of God made he man." (KJV)); *Deuteronomy* 27:25 ("Cursed be he that taketh reward to slay an innocent person." (KJV)); *Proverbs* 6:16-17 ("These six things doth the Lord hate: yea, seven are an abomination to him . . . hands that shed innocent blood." (KJV)).

69.     Plaintiffs have sincerely held religious beliefs, rooted in the Scriptures listed above, that anything that condones, supports, justifies, or benefits from the taking of innocent human life

via abortion is sinful, contrary to the Scriptures, and must be denounced, condemned, and avoided altogether.

70.     Plaintiffs have sincerely held religious beliefs, rooted in the Scriptures listed above, that it is an affront to Scripture's teaching that all life is sacred for Plaintiffs to use a product derived from or connected in any way with abortion.

71.     Plaintiffs' sincerely held religious beliefs, rooted in the above Scriptures, preclude them from accepting any one of the three currently available COVID-19 vaccines, because all three vaccines were derived from, produced, manufactured by, tested on, developed with, or otherwise connected to aborted fetal cell lines.

72.     Plaintiffs have sincerely held religious objections to the Johnson & Johnson (Janssen Pharmaceuticals) vaccine because it unquestionably used aborted fetal cells lines to produce and manufacture the vaccines.

73.     As reported by the North Dakota Department of Health, in its handout literature for those considering one of the COVID-19 vaccines, "[t]he non-replicating viral vector vaccine produced by Johnson & Johnson **did require the use of fetal cell cultures, specifically PER.C6, in order to produce and manufacture the vaccine**." *See* North Dakota Health, *COVID-19 Vaccines & Fetal Cell Lines* (Apr. 20, 2021), *available at* https://www.health.nd.gov/sites/www/files/documents/COVID%20Vaccine%20Page/COVID-19_Vaccine_Fetal_Cell_Handout.pdf (last visited Aug. 2, 2021) (bold emphasis original).

74.     The Louisiana Department of Health likewise confirms that the Johnson & Johnson COVID-19 vaccine, which used PER.C6 fetal cell line, "is a retinal cell line that was **isolated from a terminated fetus in 1985**." Louisiana Department of Public Health, *You Have Questions, We Have Answers: COVID-19 Vaccine FAQ* (Dec. 12, 2020), *available at*

https://ldh.la.gov/assets/oph/Center-PHCH/Center-PH/immunizations/You_Have_Qs_COVID-19_Vaccine_FAQ.pdf (last visited Aug. 2, 2021) (emphasis added).

75.     Scientists at the American Association for the Advancement of Science have likewise published research showing that the Johnson & Johnson vaccine used aborted fetal cell lines in the development and production phases of the vaccine. *Meredith Wadman*, *Vaccines that use human fetal cells draw fire*, Science (June 12, 2020), *available at* https://science.sciencemag.org/content/368/6496/1170.full (last visited Aug. 2, 2021).

76.     Plaintiffs also have sincerely held religious objections to the Moderna and Pfizer/BioNTech COVID-19 vaccines because both of these vaccines, too, have their origins in research on aborted fetal cells lines.

77.     As reported by the North Dakota Department of Health, in its handout literature for those considering one of the COVID-19 vaccines, the Moderna and Pfizer mRNA vaccines are ultimately derived from research and testing on aborted fetal cell lines. In fact, "[e]arly in the development of mRNA vaccine technology, **fetal cells were used for 'proof of concept' (to demonstrate how a cell could take up mRNA and produce the SARS-CoV-2 spike protein) or to characterize the SARS-CoV-2 spike protein**." *See* North Dakota Health, *COVID-19 Vaccines & Fetal Cell Lines* (Apr. 20, 2021), *available at* https://www.health.nd.gov/sites/www/files/documents/COVID%20Vaccine%20Page/COVID-19_Vaccine_Fetal_Cell_Handout.pdf (last visited Aug. 2, 2021) (emphasis added).

78.     The Louisiana Department of Health's publications again confirm that aborted fetal cells lines were used in the "proof of concept" phase of the development of their COVID-19 mRNA vaccines. Louisiana Department of Public Health, *You Have Questions, We Have Answers: COVID-19 Vaccine FAQ* (Dec. 12, 2020), *available at* https://ldh.la.gov/assets/oph/Center-

PHCH/Center-PH/immunizations/You_Have_Qs_COVID-19_Vaccine_FAQ.pdf (last visited Aug. 2, 2021).

79. Because all three of the currently available COVID-19 vaccines are developed and produced from, tested with, researched on, or otherwise connected with the aborted fetal cell lines HEK-293 and PER.C6, Plaintiffs' sincerely held religious beliefs compel them to abstain from obtaining or injecting any of these products into their body, regardless of the perceived benefit or rationale.

80. In addition, Plaintiffs have sincerely held religious beliefs that their body is the temple of the Holy Spirit, and to inject medical products that have any connection whatsoever to aborted fetal cell lines would be defiling the Temple of the Holy Spirit. (*See 1 Corinthians* 6:15-20 ("Know ye not that your bodies are the members of Christ? shall I then take the members of Christ and make them members of an harlot? God forbid. . . . What? Know ye not that your body is the temple of the Holy Ghost which is in you, which have of God, and ye are not your own? For ye are bought with a price: therefore glorify God in your body, and in your spirit, which are God's." (KJV)).

81. While there may be some faith leaders and other adherents whose understanding of Scripture is different, and who may be willing to accept one of the three currently available COVID-19 vaccines despite their connection with aborted fetal cell lines, Plaintiffs' sincerely held religious beliefs compel them to adhere to the truth that the testing, development, production, or other connection to aborted fetal cell lines is morally and Scripturally unacceptable and an affront to Scripture's teachings that God values all human life, and that abortion – in all of its manifestations and with all of its so-called 'benefits' – is a grave sin in which Plaintiffs cannot participate.

82.     In addition to their sincerely held religious beliefs that compel them to abstain from any connection to the grave sin of abortion, Plaintiffs have sincerely held religious beliefs that the Holy Spirit – through prayer and the revelation of Scripture – guide them in all decisions they make in life.

83.     Plaintiffs have sincerely held religious beliefs that Jesus Christ came to this earth, died on the cross for their sins, was resurrected three days later, and that when He ascended to Heaven, He sent the Holy Spirit to indwell His Believers and to guide them in all aspects of their lives. *See John* 16:7 ("Nevertheless I tell you the truth, it is expedient for you that I go away: for if I go not away, the Comforter will not come unto you; but if I depart, I will send him unto you." (KJV)); *John* 14:26 ("But the Comforter, which is the Holy Ghost, whom the Father will send in my name, he shall teach you all things, and bring all things to your remembrance, whatsoever I have said unto you." (KJV)).

84.     Plaintiffs have sincerely held religious beliefs that the Holy Spirit was given to them by God to reprove them of righteousness and sin and to guide them into all truth. *See John* 16:8,13 ("And when he is come, he will reprove the world of sin, and of righteousness, and of judgment . . . when he, the Spirit of truth, is come, he will guide you into all truth: for he shall not speak of himself; but whatsoever he shall hear, that shall he speak: and he will shew you things to come." (KJV)).

85.     Plaintiffs also have sincerely held religious beliefs that they shall receive all answers to their questions through prayer and supplication, including for decisions governing their medical health. *See James* 1:5 ("If any of you lack wisdom, let him ask of God, that giveth to all men liberally, and upbraideth not; and it shall be given him." (KJV)); *Mark* 11:24 ("Therefore I say unto you, What things soever ye desire, when ye pray, believe that ye receive them, and ye

shall have them." (KJV)); *Philippians* 4:6-7 ("but in everything by prayer and supplication with thanksgiving let your request be made known to God. And the peace of God, which passeth all understanding, shall keep your hearts and minds through Christ Jesus." (KJV)); *1 John* 4:14-15 ("And this is the confidence we have in him, that, if we ask anything according to his will, he heareth us. And if we know that he hear us, whatsoever we ask, we know that we have the petitions that we desired of him." (KJV)).

86.     Through much prayer and reflection, Plaintiffs have sought wisdom, understanding, and guidance on the proper decision to make concerning these COVID-19 vaccines, and Plaintiffs have been convicted by the Holy Spirit in their beliefs that accepting any of the three currently available vaccines is against the teachings of Scripture and would be a sin.

87.     Plaintiffs have sincerely held religious beliefs that compel them to follow the teachings of the Holy Spirit, who has not given them peace or comfort to accept any of the three currently available COVID-19 vaccines.

88.     Plaintiffs have sincerely held religious beliefs that they are being guided and instructed by the Holy Spirit not to accept any of the three currently available COVID-19 vaccines and that it would be a sin against God to do so.

89.     Plaintiffs have shared these religious beliefs, and others, with Astellas, and have asked Astellas for exemption and reasonable accommodation for these beliefs, but Astellas has illegally and callously refused.

**D.     PLAINTIFFS' WILLINGNESS TO COMPLY WITH ALTERNATIVE SAFETY MEASURES.**

90.     Plaintiffs had always been willing to comply with all other reasonable alternatives to compliance with the Mandatory COVID-19 Vaccination Policy.

91.     Plaintiffs were willing to and would have complied with all requirements to wear a mask, if necessary, as a part of the reasonable accommodation for their sincerely held religious objection to the Mandatory COVID-19 Vaccination Policy.

92.     Plaintiffs were willing to and would have complied with surveillance testing protocols as part of their reasonable accommodation for their sincerely held religious objection to the Mandatory COVID-19 Vaccination Policy.

93.     Plaintiffs were willing to and would have complied with all self-monitoring, self-reporting, or other reasonable safety protocols to monitor and report any sign of symptoms or other issues, as part of their reasonable accommodation for their sincerely held religious objection to the Mandatory COVID-19 Vaccination Policy.

94.     Plaintiffs were willing to and would have complied with any reasonable request to accomplish their pursuit of obtaining a reasonable accommodation for their sincerely held religious objection to the Mandatory COVID-19 Vaccination Policy.

## COUNT I – VIOLATION OF THE ILLINOIS HEALTH CARE RIGHTS OF CONSCIENCE ACT, 745 ILCS 70

95.     Plaintiffs hereby reallege and adopt each and every allegation in paragraphs 1-94 as if fully set forth herein.

96.     The Illinois Health Care Right of Conscience Act (the "Act") protects Plaintiffs' rights to engage in the exercise of their sincerely held religious beliefs without fear of discrimination from any entity, whether public or private, including Astellas.

97.     In fact, the State of Illinois has declared it to be the public policy of the State to protect the religious conscience rights of all individuals in the State of Illinois as it relates to health care services. The Illinois Health Care Right of Conscience Act provides, specifically,

The General Assembly finds and declares that people and organizations hold different beliefs about whether certain health care services are morally acceptable. **It is the public policy of the State of Illinois to respect and protect the right of conscience of all persons who refuse to obtain, receive or accept, or who are engaged in, the delivery of, arrangement for, or payment of health care services and medical care whether acting individually, corporately, or in association with other persons; and to prohibit all forms of discrimination, disqualification, coercion, disability or imposition of liability upon such persons or entities by reason of their refusing to act contrary to their conscience or conscientious convictions in providing, paying for, or refusing to obtain, receive, accept, deliver, pay for, or arrange for the payment of health care services and medical care**. It is also the public policy of the State of Illinois to ensure that patients receive timely access to information and medically appropriate care.

745 ILCS 70/2 (emphasis added).

98.     In furtherance of the State of Illinois public policy of protecting the religious conscience rights of all Illinoisans to exercise their sincere religious convictions in their medical decision-making, the Illinois Health Care Right of Conscience Act states:

**It shall be unlawful for any** person, public or **private institution**, or public official **to discriminate against any person in any manner**, including but not limited to, licensing, hiring, promotion, transfer, staff appointment, hospital, managed care entity, or **any other privileges**, **because of such person's conscientious refusal to receive, obtain, accept, perform, assist, counsel, suggest, recommend, refer or participate in any way in any particular form of health care services contrary to his or her conscience**.

745 ILCS 70/5 (emphasis added).

99.     The Illinois Health Care Right of Conscience Act further provides:

**It shall be unlawful for any public or private** employer, entity, agency, **institution**, official or person, including but not limited to, a medical, nursing or other medical training institution, to deny admission because of, to place any reference in its application form concerning, to orally question about, to impose any burdens in terms or conditions of employment on, or to otherwise discriminate against, any applicant, in terms of employment, **admission to or participation in any programs for which the applicant is eligible, or to discriminate in relation thereto, in any other manner, on account of the applicant's refusal to receive, obtain, accept, perform, counsel, suggest, recommend, refer, assist or participate in any way in any forms of health care services contrary to his or her conscience.**

24

745 ILCS 70/7 (emphasis added).

100.     The Illinois Health Care Right of Conscience Act defines "Health care" broadly to include vaccinations. Specifically, it provides that "Health Care":

> means **any phase** of patient care, including but not limited to, **testing**; diagnosis; **prognosis**; ancillary research; **instructions**; family planning, counselling, referrals, or any other advice in connection with the use or procurement of contraceptives and sterilization or abortion procedures; **medication**; surgery or **other care or treatment rendered by a physician or physicians, nurses, paraprofessionals or health care facility**, **intended** for the **physical**, emotional, and mental well-being of persons.

745 ILCS 70/3 (a) (emphasis added).

101.     The Illinois Health Care Right of Conscience Act defines "Conscience," as "a sincerely held set of moral convictions arising from belief in or relation to God, or which, though not so derived, arises from a place in the life of its possessor parallel to that filled by God among adherents to religious faiths." 745 ILCS 70/3(e).

102.     A violation of the Illinois Health Care Right of Conscience Act provides for the following remedies:

> **Any person, association, corporation, entity or health care facility injured by any public or private person, association, agency, entity or corporation by reason of any action prohibited by this Act may commence a suit therefor, and shall recover threefold the actual damages, including pain and suffering, sustained by such person, association, corporation, entity or health care facility, the costs of the suit and reasonable attorney's fees; but in no case shall recovery be less than $2,500 for each violation in addition to costs of the suit and reasonable attorney's fees. These damage remedies shall be cumulative, and not exclusive of other remedies afforded under any other state or federal law**.

745 ILCS 70/12 (emphasis added).

103.     The Illinois Health Care Right of Conscience Act acts as a super statute in Illinois, preempting and superseding all other acts and portions of acts that conflict with the explicit policies contained in the statute.

104.    Specifically, the Illinois Health Care Right of Conscience Act states: "This Act shall supersede all other Acts or parts of Acts to the extent that any Acts or parts of Acts are inconsistent with the terms or operation of this Act." 745 ILCS 70/14.

105.    Even as a private institution, Astellas is subject to the provision of the Illinois Health Care Right of Conscience Act under 745 ILCS 70/5 and 745 ILCS 70/7, and is therefore prohibited from discriminating against Plaintiffs for their refusal to accept one of the vaccines on account of their sincerely held religious beliefs.

106.    Plaintiffs' sincerely held religious beliefs, which were articulated to Astellas under the signed written requests required by the Mandatory COVID-19 Vaccination Policy, constitute Plaintiffs' "conscience" under the Act because they are "a sincerely held set of moral convictions arising from belief in or relation to God." 745 ILCS 70/3(e).

107.    The COVID-19 vaccines constitute "Health care" under the Act because they are a "phase of patient care," "medication," and "other care or treatment rendered by a physician or physicians, nurses, paraprofessionals or health care facility, intended for the physical, emotional, and mental well-being of persons." 745 ILCS 70/3(a).

108.    The Act does not provide any defense to discriminate against Plaintiffs based on so-called "undue hardship." *Rojas v. Martell*, 2020 IL App (2d) 190215, ¶ 43.

109.    By imposing its Mandatory COVID-19 Vaccination Policy upon Plaintiffs and refusing to grant them religious exemptions and reasonable accommodations from the Mandatory COVID-19 Vaccination Policy, Astellas has impermissibly, unlawfully, and unconscionably discriminated against Plaintiffs because of their conscientious refusal to receive or accept one of the three currently available COVID-19 vaccines in contradiction to their rights of conscience and sincerely held religious beliefs.

110.     By threatening Plaintiffs with adverse employment action for failure to comply with the Mandatory COVID-19 Vaccination Policy, Astellas has impermissibly discriminated against the Plaintiffs on account of their sincerely held religious objections to receiving or accepting one of the three COVID-19 vaccines in violation of 745 ILCS 70/5.

111.     The Mandatory COVID-19 Vaccination Policy, on its face and as applied, is a gross violation of Plaintiffs' sincerely held beliefs, and their rights of conscience under the Illinois Health Care Right of Conscience Act.

112.     The Mandatory COVID-19 Vaccination Policy, on its face and as applied, is an impermissible discrimination against Plaintiffs on the basis of their sincerely held religious beliefs, and in violation of Plaintiffs' rights of conscience under the Illinois Health Care Right of Conscience Act.

WHEREFORE, Plaintiffs respectfully pray for relief against Astellas as set forth in their Prayer for Relief.

## COUNT II – VIOLATION OF TITLE VII, 42 U.S.C. § 2000e, *et seq.*

113.     Plaintiffs hereby reallege and adopt each and every allegation in paragraphs 1-112 as if fully set forth herein.

114.     Title VII of the Civil Rights Act of 1964 prohibits Astellas from discriminating against its employees on the basis of their sincerely held religious beliefs. *See* 42 U.S.C. §2000e-2(a)

115.     Plaintiffs hold sincere religious beliefs that preclude them from receiving a COVID-19 vaccine.

116.     Plaintiffs informed Astellas of those beliefs and requested religious exemptions and reasonable accommodations from the vaccine mandate.

117.     Astellas has failed to engage in the interactive process with Plaintiffs regarding their religious accommodation requests.

118.     Irrespective of the interactive process, Astellas failed to provide Plaintiffs with religious exemptions and reasonable accommodations, thereby discriminating against Plaintiffs because of their religious beliefs.

119.     Astellas' failure to provide religious exemptions and accommodations has harmed and will continue to harm the Plaintiffs.

120.     By failing to engage in the interactive process or offer any reasonable accommodation, Astellas' discriminatory actions were intentional and/or reckless and in violation of Title VII.

121.     Plaintiffs have filed charges with the EEOC complaining of these discriminatory actions and have requested immediate "Right to Sue" letters. Attached as **Exhibit N**, are the "Right to Sue" letters received by the Plaintiffs.[4]

WHEREFORE, Plaintiffs respectfully pray for relief against Astellas as set forth in their Prayer for Relief.

## PRAYER FOR RELIEF

WHEREFORE, Plaintiffs respectfully pray for relief as follows:

A. That this Court render a Declaratory Judgment declaring that Astellas' Mandatory COVID-19 Vaccination Policy, both on its face and as applied by Astellas, is illegal and unlawful under the Illinois Health Care Right of Conscience Act, 745 ILCS 70/5 and 745 ILCS 70/7, and Title VII, 42 U.S.C. § 2000e, *et seq*. and further declaring that:

---

[4] Of the named Plaintiffs, only Lewan, Clegg, Langley, and Giacchino still have not received their Right to Sue letters. Each one has requested immediate right to sue letters and expect to receive them shortly.

a.  by terminating Plaintiffs from employment with Astellas, Astellas has unlawfully discriminated against Plaintiffs on account of their sincerely held religious objections to receiving or accepting one of the three COVID-19 vaccines in violation of 745 ILCS 70/5 and 745 ILCS 70/7 and Title VII.

B.  That this Court award Plaintiffs and those similarly situated actual damages in an amount to be proven at trial (but not less than $2,500 per violation, as provided by 745 ILCS 70/12), and treble damages as provided by 745 ILCS 70/12, including those for emotional distress and pain and suffering, that Plaintiffs sustained as a result of Astellas' discriminatory, unconscionable, and unlawful Mandatory COVID-19 Vaccination Policy.

C.  That this Court adjudge, decree, and declare the rights and other legal obligations and relations within the subject matter here in controversy so that such declaration shall have the full force and effect of final judgment.

D.  That this Court retain jurisdiction over the matter for the purposes of enforcing the Court's order.

E.  That this Court award Plaintiffs the reasonable costs and expenses of this action, including reasonable attorneys' fees, as required by 745 ILCS 70/12 and Title VII.

F.  That this Court grant such other and further relief as the Court deems equitable and just under the circumstances.

Respectfully submitted,

/s/ Sorin A. Leahu

Sorin A. Leahu
Illinois Bar No. 6315515
PACIFIC JUSTICE INSTITUTE
310 Busse Highway, #364
Park Ridge, IL 60068 / 847-529-7221
sleahu@pji.org
*Attorney for Plaintiffs*

## **VERIFICATION**

I, Nickie Dennard, am over the age of eighteen years and am an employee of Astellas. The statements and allegations that pertain to me or which I make in this VERIFIED COMPLAINT are true and correct, and based upon my personal knowledge (unless otherwise indicated). If called upon to testify to their truthfulness, I would and could do so competently. I declare under penalty of perjury, under the laws of the United States and the State of Illinois, that the foregoing statements are true and correct to the best of my knowledge.

Dated: May _____, 2022

/s/ _____

Nickie Dennard

## **VERIFICATION**

I, Shari Lewan, am over the age of eighteen years and am a former employee of Astellas. The statements and allegations that pertain to me or which I make in this VERIFIED COMPLAINT are true and correct, and based upon my personal knowledge (unless otherwise indicated). If called upon to testify to their truthfulness, I would and could do so competently. I declare under penalty of perjury, under the laws of the United States and the State of Illinois, that the foregoing statements are true and correct to the best of my knowledge.

Dated: May 25, 2022

/s/ Shari Lewan

Shari Lewan

## VERIFICATION

I, Jessica Vandenbosch, am over the age of eighteen years and am a former employee of Astellas. The statements and allegations that pertain to me or which I make in this VERIFIED COMPLAINT are true and correct, and based upon my personal knowledge (unless otherwise indicated). If called upon to testify to their truthfulness, I would and could do so competently. I declare under penalty of perjury, under the laws of the United States and the State of Illinois, that the foregoing statements are true and correct to the best of my knowledge.

Dated: May 25, 2022

/s/ Jessica Vandenbosch

Jessica Vandenbosch

## **VERIFICATION**

I, Stephen Sleem, am over the age of eighteen years and am a former employee of Astellas. The statements and allegations that pertain to me or which I make in this VERIFIED COMPLAINT are true and correct, and based upon my personal knowledge (unless otherwise indicated). If called upon to testify to their truthfulness, I would and could do so competently. I declare under penalty of perjury, under the laws of the United States and the State of Illinois, that the foregoing statements are true and correct to the best of my knowledge.

Dated: May 25ᵗʰ, 2022

Stephen Sleem

## **VERIFICATION**

I, Derek Johnson, am over the age of eighteen years and am a former employee of Astellas. The statements and allegations that pertain to me or which I make in this VERIFIED COMPLAINT are true and correct, and based upon my personal knowledge (unless otherwise indicated). If called upon to testify to their truthfulness, I would and could do so competently. I declare under penalty of perjury, under the laws of the United States and the State of Illinois, that the foregoing statements are true and correct to the best of my knowledge.

Dated: May 25 , 2022

/s/
Derek Johnson

**<u>VERIFICATION</u>**

I, Linda Davault, am over the age of eighteen years and am a former employee of Astellas. The statements and allegations that pertain to me or which I make in this VERIFIED COMPLAINT are true and correct, and based upon my personal knowledge (unless otherwise indicated). If called upon to testify to their truthfulness, I would and could do so competently. I declare under penalty of perjury, under the laws of the United States and the State of Illinois, that the foregoing statements are true and correct to the best of my knowledge.

Dated: May 25, 2022

/s/ Linda Davault

Linda Davault

## **VERIFICATION**

I, Terrell Rehmus, am over the age of eighteen years and am a former employee of Astellas. The statements and allegations that pertain to me or which I make in this VERIFIED COMPLAINT are true and correct, and based upon my personal knowledge (unless otherwise indicated). If called upon to testify to their truthfulness, I would and could do so competently. I declare under penalty of perjury, under the laws of the United States and the State of Illinois, that the foregoing statements are true and correct to the best of my knowledge.

Dated: May _25_, 2022

/s/ _Dr. Terrell Rehmus_

Dr. Terrell Rehmus

## **VERIFICATION**

I, Jacqueline Clegg, am over the age of eighteen years and am a former employee of Astellas. The statements and allegations that pertain to me or which I make in this VERIFIED COMPLAINT are true and correct, and based upon my personal knowledge (unless otherwise indicated). If called upon to testify to their truthfulness, I would and could do so competently. I declare under penalty of perjury, under the laws of the United States and the State of Illinois, that the foregoing statements are true and correct to the best of my knowledge.

Dated:  May  _25_ , 2022

/s/

Jacqueline Clegg

## **VERIFICATION**

I, Regina Langley, am over the age of eighteen years and am a former employee of Astellas. The statements and allegations that pertain to me or which I make in this VERIFIED COMPLAINT are true and correct, and based upon my personal knowledge (unless otherwise indicated). If called upon to testify to their truthfulness, I would and could do so competently. I declare under penalty of perjury, under the laws of the United States and the State of Illinois, that the foregoing statements are true and correct to the best of my knowledge.

Dated: May 25 , 2022

/s/ _Regina Langley_
Regina Langley

**VERIFICATION**

I, Gerald Kreutzer, am over the age of eighteen years and am a former employee of Astellas. The statements and allegations that pertain to me or which I make in this VERIFIED COMPLAINT are true and correct, and based upon my personal knowledge (unless otherwise indicated). If called upon to testify to their truthfulness, I would and could do so competently. I declare under penalty of perjury, under the laws of the United States and the State of Illinois, that the foregoing statements are true and correct to the best of my knowledge.

Dated: May 28th, 2022

/s/ Gerald Kreutzer

## **VERIFICATION**

I, Michael Giacchino, am over the age of eighteen years and am a former employee of Astellas. The statements and allegations that pertain to me or which I make in this VERIFIED COMPLAINT are true and correct, and based upon my personal knowledge (unless otherwise indicated). If called upon to testify to their truthfulness, I would and could do so competently. I declare under penalty of perjury, under the laws of the United States and the State of Illinois, that the foregoing statements are true and correct to the best of my knowledge.

Dated:     May _27_, 2022

Michael Giacchino